IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA23-1083

Filed 20 August 2025

Durham County, No. 22CVS004521-310

ROBIN BAREFOOT, HAROLD KOENIG, JUANITA PEARCE, MARTY PEARCE, RUSSELL SCOTT RIGGS, and JAI G. RIGGS, Plaintiffs,

v.

DURHAM COUNTY, Defendant.

Appeal by plaintiffs from order entered 16 August 2023 by Judge Beecher Reynolds Gray in Superior Court, Durham County. Heard in the Court of Appeals 11 June 2024.

> *The Brough Law Firm, PLLC, by Brady N. Herman and T.C. Morphis Jr., for plaintiff-appellants Robin Barefoot, Harold Koenig, Juanita Pearce, Marty Pearce, Russell Scott Riggs, and Jai G. Riggs.*

> *Fox Rothschild LLP, by Patrick M. Kane, Kip D. Nelson, and La-Deidra Matthews, and Durham County Attorney's Office, by Curtis Massey, for defendant-appellee Durham County.*

STROUD, Judge.

Plaintiffs Robin Barefoot, Harold Koenig, Juanita Pearce, Marty Pearce, Russell Scott Riggs, and Jai G. Riggs appeal from the trial court's order denying their motion for summary judgment and granting Defendant Durham County's motion for summary judgment. Because the trial court's order fails to comply with the plain language in Defendant's unified development ordinance ("UDO"), and because

Plaintiffs are entitled to attorneys' fees, we reverse and remand.

## I.    Background

In 2006, Durham County's ("the County's") UDO was amended to add Section 6.2.4, which provided for the creation of conservation subdivisions. An alternative to conventional subdivisions, a conservation subdivision allows for clustered development, higher residential density, and flexible lot sizes to protect larger, undeveloped spaces.

Generally, the approval of a conservation subdivision site plan is an administrative process that does not require a public hearing. However, the proposed conservation subdivision in this case, a 141-lot subdivision called Mason Farms, required the approval of a special use permit for its community water and wastewater systems in addition to its site plan, which required a public hearing. On 28 November 2022, following a hearing, the Board of Commissioners ("the Board") unanimously approved the site plan and special use permit for Mason Farms.

On 28 December 2022, Plaintiffs, who all live within 650 feet of the proposed development, filed a complaint contesting the Board's approval of the site plan. Plaintiffs sought a declaratory judgment that the approval of the site plan was void because the Board failed to comply with the requirements of the UDO. Specifically, Plaintiffs argued the site plan failed to meet all twelve of the stated purposes in Section 6.2.4A, so the Board's approval was *ultra vires* and arbitrary and capricious.

On 26 May 2023, the County moved for a judgment on the pleadings. The

County argued that Section 6.2.4A merely listed twelve "various purposes for which a conservation subdivision [was] appropriate[,]" and approval of a conservation subdivision did not mandate all twelve purposes be fulfilled. Instead, the County argued the "actual requirements" were found in subsequent sections and as these requirements were met, the Board properly approved the site plan.

On 12 July 2023, Plaintiffs moved for summary judgment. Both motions were heard on 24 July 2023, with the trial court converting the County's motion into a motion for summary judgment to consider a subsequent affidavit. By order entered 16 August 2023, the court denied Plaintiffs' motion for summary judgment, granted the County's motion for summary judgment, and dismissed Plaintiffs' claims. Plaintiffs timely appealed.

## II. Standard of Review

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C. Gen. Stat. § 1A-1, Rule 56(c) (2023). We review the lower court's summary judgment ruling *de novo*. *See Brown v. City of Winston-Salem*, 171 N.C. App. 266, 270, 614 S.E.2d 599, 602 (2005).

Underlying the trial court's summary judgment ruling is the Board's interpretation and application of the UDO when it approved the Mason Farms site plan. "Questions involving the interpretation of ordinances are questions of law."

*Ayers v. Bd. of Adjustment*, 113 N.C. App. 528, 531, 439 S.E.2d 199, 201 (1994). "[O]n appeal of the judgment of the superior court, this Court must apply a *de novo* standard of review in determining whether 'the superior court committed error of law in interpreting and applying the municipal ordinance,' and may also freely substitute its judgment for that of the superior court." *Hayes v. Fowler*, 123 N.C. App. 400, 404, 473 S.E.2d 442, 445 (1996) (quoting *Capricorn Equity Corp. v. Town of Chapel Hill Bd. of Adjustment*, 334 N.C. 132, 137, 431 S.E.2d 183, 187 (1993)).

## III.    Analysis

Both Plaintiffs and the County acknowledge that the outcome hinges upon appropriately interpreting and applying Section 6.2.4A, which states that a

> conservation subdivision shall be established for the following purposes:
>
> 1. To provide flexibility of design in order to promote environmentally sensitive and efficient uses of the land;
>
> 2. To preserve in perpetuity unique or sensitive natural resources such as groundwater, floodplains, wetlands, streams, steep slopes, woodlands and wildlife habitat;
>
> 3. To preserve important historic and archaeological sites;
>
> 4. To permit clustering of houses and structures on less environmentally sensitive soils which will reduce the amount of infrastructure, including paved surfaces and utility easements, necessary for residential development;
>
> 5. To reduce erosion and sedimentation by minimizing land disturbance and removal of vegetation in residential development;
>
> 6. To promote interconnected greenways and corridors

throughout the community;

7. To promote contiguous green space with adjacent jurisdictions;

8. To encourage interaction in the community by clustering houses and orienting them closer to the street, providing public gathering places and encouraging use of parks and community facilities as focal points in the neighborhood;

9. To encourage street designs that reduce traffic speeds and reliance on main arteries;

10. To promote construction of landscaped walking trails and bike paths conveniently located both within the subdivision and connected to neighboring communities, businesses and facilities to reduce reliance on automobiles;

11. To conserve scenic views from public roadways and reduce perceived density; and

12. To protect prime agricultural land and preserve farming as an economic activity.

Plaintiffs contend that Section 6.2.4A establishes twelve requirements, each of which must be met for a conservation subdivision to be approved. As the site plan only met six of the twelve requirements, Plaintiffs argue the Board's approval was erroneous, and the trial court erred in granting summary judgment for the County. Plaintiffs assert the trial court's ruling should be reversed because they are entitled to summary judgment on all their claims—that the Board's decision to approve the site plan was void, as well as arbitrary, capricious, and *ultra vires*. We agree.

**A. Statutory Construction**

It is well-established that "[t]he rules applicable to the construction of statutes are equally applicable to the construction of municipal ordinances." *Cogdell v. Taylor*, 264 N.C. 424, 428, 142 S.E.2d 36, 39 (1965) (citations omitted). Thus, "[t]he basic rule is to ascertain and effectuate the intent of the legislative body[.]" *Coastal Ready-Mix Concrete Co., Inc. v. Bd. of Comm'rs*, 299 N.C. 620, 629, 265 S.E.2d 379, 385 (1980) (citations omitted). Intent is determined "by examining (i) language, (ii) spirit, and (iii) goal of the ordinance." *Capricorn Equity Corp. v. Chapel Hill*, 334 N.C. 132, 138, 431 S.E.2d 183, 188 (1993) (citation omitted). Where the language of the ordinance is "clear and unambiguous, there is no room for judicial construction and the courts must give it its plain and definite meaning, and are without power to interpolate, or superimpose, provisions and limitations not contained therein." *In re Town of Smithfield*, 230 N.C. App. 252, 255, 749 S.E.2d 293, 295 (2013) (quoting *In re Miller*, 357 N.C. 316, 324, 584 S.E.2d 772, 780 (2003)).

Plaintiffs first contend that the use of the word "shall" at the opening of Section 6.2.4A—"[t]he conservation subdivision shall be established for the following purposes"—establishes the intent to make the listed purposes mandatory. The County contends Section 6.2.4A is merely an extended purpose statement, based on the section being titled "Purpose," that provides "an overview of the potential goals" for a conservation subdivision, not necessarily twelve "specific requirements" to be imposed "on each and every conservation subdivision." The County further argues that a consideration of Section 6.2.4 as a whole confirms the use of "shall" in Section

6.2.4A was not intended to mandate additional requirements for approval of a conservation subdivision.

While it is true that the use of "shall" does not always evince an intention to make a provision mandatory, *see State v. House*, 295 N.C. 189, 203, 244 S.E.2d 654, 662 (1978), the UDO itself bars any other interpretation. UDO Section 17.1(C) provides that "[t]he word 'shall' is mandatory." Because there is no ambiguity in the meaning of "shall" in Section 6.2.4A, we "need look no further" to determine that the twelve purposes for conservation subdivisions in Section 6.2.4A are not merely suggestions. *Westminster Homes, Inc. v. Town of Cary Zoning Bd. of Adjustment*, 354 N.C. 298, 304, 554 S.E.2d 634, 638 (2001). However, even considering the conservation subdivision ordinance holistically, the County's argument fails.

The County contends that the sections following Sections 6.2.4A, including Sections 6.2.4B "Applicability of Regulations," 6.2.4D "Density Calculation," and 6.2.4F "Open Space Requirements," contain the "technical requirements" a developer must satisfy for the approval of a conservation subdivision. And these specific requirements supersede the general requirements outlined in Section 6.2.4A, citing *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645, 182 L. Ed. 2d 967, 974 (2012) ("It is a commonplace of statutory construction that the specific governs the general." (citations, quotation marks, and brackets omitted)). The County contends our appellate courts specifically applied this principle to a land use

ordinance purpose statement in *Guilford Financial Services, LLC v. City of Brevard*, 150 N.C. App. 1, 563 S.E.2d 27 (2002).

In *Guilford Financial*, the city council rejected a proposed subdivision containing fifteen duplexes based, in part, on a purported requirement that duplexes be "unconcentrated." *Id.* at 2-5, 563 S.E.2d at 29-30. The use of the word "unconcentrated" was only found in the section titled "Purpose," which stated that a subdivision should "protect areas in which the principal use of the land is for medium density single and unconcentrated two-family dwellings[.]" *Id.* at 15, 563 S.E.2d at 36 (Tyson, J., concurring in part and dissenting in part). The dissenting judge argued this general statement could not be used to reject the proposed duplex development because it complied with the specific minimum lot area requirement of another section. *See id.* at 15-17, 563 S.E.2d at 36-37. Our Supreme Court agreed with the dissent and reversed the subdivision denial. *See Guilford Fin. Servs. v. City of Brevard*, 356 N.C. 655, 576 S.E.2d 325 (2003) (per curiam).

However, *Guilford Financial* is inapplicable to the facts before us. Beyond being located under a section titled "Purpose," there are no similarities between the challenged ordinance in *Guilford Financial* and Section 6.2.4A. The ordinance in *Guilford Financial* was undeniably general, providing a broad overview of the intention behind creating subdivisions. *See Guilford Fin. Servs.*, 150 N.C. App. at 14-15, 563 S.E.2d 35-36. The word "unconcentrated" was similarly general, and there was no definition for that term in the ordinances. *Id.* Here, Section 6.2.4A uses

appreciably specific language for twelve discrete purposes of a conservation subdivision, such as "[t]o promote construction of landscaped walking trails and bike paths conveniently located both within the subdivision and connected to neighboring communities, businesses and facilities to reduce reliance on automobiles[.]" Again, Section 6.2.4A also states these "shall" be the purposes of a conservation subdivision, with "shall" a defined, mandatory term in the UDO. The fact that Section 6.2.4A is titled "Purpose" cannot override the plain, specific language in the Section itself. *See First Bank v. S&R Grandview, L.L.C.*, 232 N.C. App. 544, 551, 755 S.E.2d 393, 397 (2014) ("Although we agree that the title of an Article in which a statute is placed can be relevant when interpreting the statute, the placement of a statute within an Act is less probative of legislative intent than the plain language of the statute itself.").

Moreover, the County disproves its own argument by pointing to other sections as containing the "specific standards and regulations that govern the approval of a conservation subdivision." The County explicitly includes Section 6.2.4B as containing these specific requirements. That section, "Applicability of Regulations," originally allowed for a conservation subdivision "as a use by right subject to subdivision approval in accordance with Sec. 3.6, Subdivision Review." However, since its amendment in 2008, Section 6.2.4B allows for a conservation subdivision "as a use by right subject to subdivision approval in accordance with Sec. 3.6, Subdivision Review, *and in accordance with the standards set forth in Sec. 6.2.4A, Purpose,* and Sec. 6.2.4F, Primary and Secondary Conservation Areas." (Emphasis added.)

Further, unlike with Section 6.2.4A, the drafters of the UDO specifically disclaimed the use of general purpose statements as regulations in other sections of the ordinance. In Section 1.2, "Purpose and Intent," the UDO delineates the overarching purposes for its existence, such as "to promote the health, safety and general welfare of the residents" in Section 1.2.1, and "provide for the orderly, efficient and economic development of the [c]ity and [c]ounty" in Section 1.2.3. Then, Section 1.2.4 states that "[t]he purpose and intent statements described above shall not be construed as Ordinance regulations, but as the purpose and intent for the regulations within the subsequent articles and sections of the Ordinance." The County does not address Section 1.2.4 or why this statement would not appear in Section 6.2.4A if it was intended to merely convey the "potential goals" of a conservation subdivision.

Indeed, to arrive at the County's preferred interpretation that the requirements of Section 6.2.4A are mere suggestions, we would need to do the very thing the County disclaims: analyze Section 6.2.4A in a vacuum and not within the full context of the UDO. Moreover, we would have to ignore the plain language within Section 6.2.4A and construe the use of "shall" to actually mean "may," which we cannot do. "When the language of a statute is clear and unambiguous, it must be given effect and its clear meaning may not be evaded by an administrative body or a court under the guise of construction." *State ex rel. Util. Comm'n v. Edmisten*, 291 N.C. 451, 465, 232 S.E.2d 184, 192 (1977). Thus, we conclude the plain language in

Section 6.2.4A, considered along with the plain language throughout the UDO, establishes that the twelve purposes in Section 6.2.4A are requirements for conservation subdivisions, not suggestions.

However, this conclusion does not necessarily make the site plan approval erroneous. It is uncontested that the Mason Farms site plan met six of the twelve purposes in Section 6.2.4A. But Plaintiffs contend this compliance is insufficient for approval because the use of the conjunctive "and" between the last two purposes in Section 6.2.4A indicates that all twelve are mandatory:

> 11. To conserve scenic views from public roadways and reduce perceived density; *and*

> 12. To protect prime agricultural land and preserve farming as an economic activity.

(Emphasis added.) In a seeming about-face, the County argues that a conservation subdivision can be established if "at least one of" the previously argued non-mandatory purposes in Section 6.2.4A is met. The County contends that the use of "and" is merely used to connect the elements, not to "connote cumulative conditions[,]" citing the recent United States Supreme Court ruling in *Pulsifer v. United States*, 601 U.S. 124, 218 L. Ed. 2d 77 (2024).

At issue in *Pulsifer* was the criminal history requirement, referred to as Paragraph (f)(1), in the "safety valve" provision of federal sentencing law that "exempts certain defendants from mandatory minimum penalties, thus enabling courts to give them lighter prison terms." *Id.* at 127, 218 L. Ed. 2d at 83. To meet

the requirements in Paragraph (f)(1), a defendant cannot have: "(A) more than 4 criminal history points," "(B) a prior 3-point offense," "*and* (C) a prior 2-point violent offense[.]" *Id.* at 129, 218 L. Ed. 2d at 84 (citing 18 U.S.C. § 3553(f)(1)) (emphasis added).

The defendant in *Pulsifer* had two prior convictions, each for a three-point offense. *See id.* at 130, 218 L. Ed. 2d. at 85. He argued that he met the Paragraph (f)(1) requirements because he did not have a two-point violent offense, and only a combination of subparagraphs (A), (B), and (C) would disqualify him from relief. *See id.* at 130-31, 218 L. Ed. 2d at 85. The government argued that each specification under Paragraph (f)(1) must be met, and because the defendant did not meet either subparagraph (A) or (B), he had no right to relief. *See id.* at 130, 218 L. Ed. 2d at 85.

The Supreme Court adopted the government's argument and held that a defendant was only eligible for relief if he did not have "all three of the items listed— or said more specifically, does not have four criminal-history points, does not have a prior three-point offense, and does not have a prior two-point violent offense." *Id.* at 132, 218 L. Ed. 2d at 86. Thus, Paragraph (f)(1) created "an eligibility checklist, and demands that a defendant satisfy every one of its conditions." *Id.*

The County presents the defendant's argument in *Pulsifer* as "the word 'and' meant that simultaneous fulfillment of *all three* conditions was required, while the government argued that only one condition was required." (Emphasis in original.) This odd phrasing is then used to support the County's assertion that "and" is often

"a connector, not a multiplier[,]" so the fulfillment of any one of the twelve enumerated purposes is sufficient. But this is contrary to the Supreme Court's holding. The "and" in Paragraph (f)(1) was also a connector, which connected three distinct checks on sentencing relief: "Only a defendant with none of those markers— a defendant who can check off every one of the three 'does not have' requirements— is eligible for relief." *Id.* at 147, 218 L. Ed. 2d at 95.

Unaddressed by the County, the Supreme Court also considered Paragraph (f)(1) in the context of the "safety valve" statute as a whole. *See id.* at 149-150, 218 L. Ed. 2d at 97. In addition to the criminal history requirement in Paragraph (f)(1), 18 United States Code Section 3553(f) lists four other requirements for minimum sentencing relief, all joined with an "and." *Id.* at 150, 218 L. Ed. 2d at 97. All parties agreed that sentencing relief was only available if a defendant fulfilled each requirement, (f)(1) through (f)(5). *Id.* Thus, the "and" between Paragraphs (f)(4) and (f)(5) connected all the requirements a defendant must meet to get relief: "So again, the 'and' joins several individually necessary conditions for safety-valve relief." *Id.* at 150, 218 L. Ed. 2d at 97.

As Plaintiffs note, much like Section 6.2.4A, Section 3553(f) provides that a court "shall" provide sentencing relief if the court finds all five requirements are met. *Id.* at 153-54, 218 L. Ed. 2d at 99-100. We agree with Plaintiffs that the benefit accorded criminal defendants in Section 3553(f)—relief from otherwise mandatory minimum sentencing—is analogous to the benefit developers obtain through a

conservation subdivision—relief from otherwise mandatory development restrictions. And as criminal defendants must meet each of the requirements provided in 18 United States Code Section 3553(f), including each of the requirements in Paragraph (f)(1), the site plan for Mason Farms needed to meet each requirement listed in Section 6.2.4A to be approved as a conservation subdivision.

## B. Application

Despite the plain language requiring a conservation subdivision to meet all twelve purposes in Section 6.2.4A, the Board approved the Mason Farms site plan that met only six. The County contends this is in line with the past application of the UDO: none of the fifteen conservation subdivisions approved since 2006 have satisfied all twelve purposes. The County contends the Board's prior application of the UDO "is entitled to great consideration[,]" citing *MacPherson v. Asheville*, 283 N.C. 299, 307, 196 S.E.2d 200, 206 (1973).

However, *MacPherson* concerned an ambiguous term that was not defined in the zoning ordinance. *See id.* at 307-08, 196 S.E.2d at 206. But where, as here, the language is clear and unambiguous, "this Court must give effect to that unambiguous language regardless of the agency's interpretation." *Total Renal Care of N.C., LLC v. N.C. Dep't of Health & Hum. Servs.*, 242 N.C. App. 666, 672, 776 S.E.2d 322, 326 (2015). For the same reason, we reject the County's arguments regarding the alleged "absurd result" that would follow from a strict adherence to the language of the UDO. *See Union Carbide Corp. v. Offerman*, 351 N.C. 310, 314, 526 S.E.2d 167, 170 (2000)

("It is well settled that where the language of a statute is clear and unambiguous, there is no room for judicial construction and the courts must give the statute its plain and definite meaning, and are without power to interpolate, or superimpose, provisions and limitations not contained therein." (citation, quotation marks, and brackets omitted)). Although the County, and our dissenting colleague, would contend that it is absurd to interpret the UDO to require conservation subdivisions to meet all twelve of the listed purposes—even if that is what the plain language of the UDO requires—absurdity is often in the eye of the beholder. Plaintiffs note that the UDO grants conservation subdivisions additional benefits not allowed for conventional subdivisions, such as higher residential density, clustering of homes, flexibility of lot sizes, and mass grading. Logically, in exchange for the additional benefits, the UDO also imposes additional requirements on conservation subdivisions. Thus, Plaintiffs contend it would be "illogical and absurd" to ignore the plain language of the UDO and to interpret the UDO to allow the development of conservation subdivisions with fewer restrictions than conventional subdivisions. Ultimately, the argument of absurdity comes down to the parties' dispute over the policy choices made by the County in adopting the UDO provisions governing conservation subdivisions, so we must apply the UDO as written.

The County is always free to make new policy choices by amending the UDO. And indeed, since the filing of this appeal, Section 6.2.4A was amended and "shall" was removed, with the introductory phrase now providing that "[t]he conservation

subdivision *standards are* established for the following purpose[.]" (Emphasis in original.) Section 6.2.4B was also amended and there is now no requirement for conservation subdivisions to meet the standards set forth in Section 6.2.4A: "This conservation subdivision option is available as a use by right subject to subdivision approval in accordance with Sec. 3.6, Subdivision Review; and in accordance with the standards set forth in paragraph 6.2.4H, Primary and Secondary Conservation Areas."

The County asserts these changes are merely clarifying amendments, made to address "issues raised in threatened, actual, or potential litigation" under the provisions outlined in UDO Section 3.19.5.B.3. Despite what the County seems to imply, there is nothing in the UDO that discusses or defines a "clarifying amendment", and Section 3.19 addresses the "Text Amendment" process generally. *See* UDO sec. 3.19 (2024), https://www.durhamnc.gov/DocumentCenter/View/54014/Durham-Unified-Development-Ordinance-UDO-Print-Version?bidId=. The County's circular reasoning—that the 2024 changes were clarifying amendments because they provided "a clarification"—is supported by one cursory citation to *Ray v. North Carolina Department of Transportation,* 366 N.C. 1, 9, 727 S.E.2d 675, 681 (2012): "A clarifying amendment, unlike an altering amendment, is one that does not change the substance of the law but instead gives further insight into the way in which the legislature intended the law to apply from its original enactment." The County

contends the 2024 "clarifying" changes established the County's "consistent application of" the UDO, and affirmed "that the Purpose statement was never intended to impose an additional set of 12 requirements[.]"

Again, the County can only achieve its preferred outcome by neglecting the foundational rule of statutory construction: "If the language used is clear and unambiguous, the Court does not engage in judicial construction but must apply the statute to give effect to the plain and definite meaning of the language." *Id.* at 8, 727 S.E.2d at 681 (citation omitted).

Despite the County's past practice or repeated assertions as to what Section 6.2.4A was supposed to do, the plain language in Section 6.2.4A—that a conservation subdivision "shall be established" for twelve enumerated purposes joined with "and"—unambiguously required a conservation subdivision to meet all twelve purposes. Because the site plan for Mason Farms did not, the Board's approval was erroneous. For the same reason, the trial court "committed error of law in interpreting and applying the municipal ordinance[,]" *Hayes*, 123 N.C. App. at 404, 473 S.E.2d at 445, and in granting the County's motion for summary judgment.

However, given there is no issue of material fact, summary judgment is the proper disposition. N.C. Gen. Stat. § 1A-1, Rule 56(c). Under the UDO, site plan approval is an administrative decision made by the Board, based on compliance with the relevant requirements and standards. "Administrative decisions are routine, nondiscretionary zoning ordinance implementation matters[.]" *Cnty. of Lancaster v.*

*Mecklenburg Cnty.*, 334 N.C. 496, 507, 434 S.E.2d 604, 612 (1993). While the administrator may engage in some fact finding to arrive at their conclusion, "this involves determining objective facts that do not involve an element of discretion." *Id.* Because the Board approved a site plan that failed to comply with the plain language of Section 6.2.4A, its approval is void, and Plaintiffs are entitled to a declaratory judgment so stating.

For the same reason, the Board's decision was arbitrary and capricious. Administrative "decisions may be reversed as arbitrary or capricious if they are patently in bad faith, or whimsical in the sense that they indicate a lack of fair and careful consideration or fail to indicate any course of reasoning and the exercise of judgment[.]" *Lewis v. N.C. Dep't of Human Res.*, 92 N.C. App. 737, 740, 375 S.E.2d 712, 714 (1989) (citations and quotations omitted). The evidence here shows the Board failed to conduct fair and careful consideration of the conservation subdivision requirements, and exercised their judgment in approving the site plan. Despite being informed that the Mason Farms site plan only met six of the twelve purposes listed in Section 6.2.4A, the Board approved the site plan under an agency report that indicated the site plan "was ordinance compliant[.]" As detailed above, a careful consideration of Section 6.2.4A would have revealed the report was erroneous and the site plan was not "ordinance compliant." Thus, Plaintiffs are entitled to a judgment declaring the Board's approval was arbitrary and capricious.

Finally, the Board's approval was *ultra vires*. The Board is authorized to either approve or deny proposed site plans. *See* N.C. Gen. Stat. § 160D-801 (2023) ("A local government may by ordinance regulate the subdivision of land within its planning and development regulation jurisdiction."). However, "[d]ecisions on approval or denial of preliminary or final plats may be made only on the basis of standards explicitly set forth in the subdivision or unified development ordinance." *Id.* As the Board's approval runs afoul of the explicit standards set forth in Section 6.2.4A, Plaintiffs are entitled to summary judgment on this claim as well.

## IV.    Conclusion

We conclude that the plain language of Section 6.2.4A establishes that the twelve enumerated purposes included therein are mandatory, and a conservation subdivision site plan may be approved only if it meets each stated purpose. Because the Mason Farms site plan only met six of the twelve purposes, the Board's approval was erroneous. Thus, we reverse the trial court's order granting summary judgment upholding that approval.

As Plaintiffs are entitled to judgment as a matter of law, we remand for entry of summary judgment in favor of Plaintiffs. On remand, the trial court should also determine the amount of attorneys' fees Plaintiffs are entitled to recover under North Carolina General Statute Section 6-21.7 (2023).

REVERSED AND REMANDED.

Judge STADING concurs.

Judge COLLINS dissents by separate opinion.

COLLINS, Judge, dissenting.

I disagree with the majority's analysis and conclusions. I therefore respectfully dissent.

As the majority notes, the parties acknowledge that the outcome hinges upon appropriately interpreting and applying Section 6.2.4.A of the UDO. This section of the UDO reads as follows:

> **6.2.4. Conservation Subdivision**
>
> **A. Purpose**
>
> The conservation subdivision shall be established for the following purposes:
>
> 1. To provide flexibility of design in order to promote environmentally sensitive and efficient uses of the land;
>
> 2. To preserve in perpetuity unique or sensitive natural resources such as groundwater, floodplains, wetlands, streams, steep slopes, woodlands and wildlife habitat;
>
> 3. To preserve important historic and archaeological sites;
>
> 4. To permit clustering of houses and structures on less environmentally sensitive soils which will reduce the amount of infrastructure, including paved surfaces and utility easements, necessary for residential development;
>
> 5. To reduce erosion and sedimentation by minimizing land disturbance and removal of vegetation in residential development;
>
> 6. To promote interconnected greenways and corridors throughout the community;

7. To promote contiguous green space with adjacent jurisdictions;

8. To encourage interaction in the community by clustering houses and orienting them closer to the street, providing public gathering places and encouraging use of parks and community facilities as focal points in the neighborhood;

9. To encourage street designs that reduce traffic speeds and reliance on main arteries;

10. To promote construction of landscaped walking trails and bike paths conveniently located both within the subdivision and connected to neighboring communities, businesses and facilities to reduce reliance on automobiles;

11. To conserve scenic views from public roadways and reduce perceived density; and

12. To protect prime agricultural land and preserve farming as an economic activity.

As established by its title, the Purpose subsection in the UDO outlines the various acceptable purposes for which the Ordinance was enacted and sets forth the scenarios in which a conservation subdivision would be suitable. The Purpose subsection is an overview of the potential goals that such a project could accomplish. The enumerated purposes do not impose, and were not intended to impose, twelve specific requirements on each and every conservation subdivision. Rather, such requirements are specified in subsequent subsections of the Conservation Subdivision Ordinance. *See* UDO §§ 6.2.4.B ("Applicability of Regulations"), 6.2.4.D

("Density Calculation"), 6.2.4.F ("Open Space Requirements"). When multiple provisions make up a statutory scheme, a generalized statement of intent that is followed by specific provisions is subject to the well-established principle that "the specific governs the general." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (citation omitted); *see Guilford Fin. Servs., LLC v. City of Brevard*, 150 N.C. App. 1 (2023), *rev'd per curiam for the reasons stated in the dissent*, 356 N.C. 655 (2023). The dissent in *Guilford*, adopted by our Supreme Court, explained that "a generalized purpose statement cannot add requirements not otherwise specified in the ordinance" and "a generalized statement of intent of the specifications that follow cannot be used as a basis to reject a permit that meets all of the requirements." 150 N.C. App. at 14, 16 (quotation marks and citations omitted).

Furthermore, the majority's opinion leads to non-sensical results. Under the majority's reasoning, a conservation subdivision must include all of the following:

- Unique sensitive natural resources (that are capable of being preserved in perpetuity) such as groundwater, floodplains, wetlands, streams, steep slopes, woodlands, and wildlife habitats (UDO § 6.2.4.A.2);
- At least one important historic or archaeological site (UDO § 6.2.4.A.3);
- Green space shared with adjacent jurisdictions (UDO § 6.2.4.A.7);
- Walking trails and bike paths that connect to neighboring communities, business, and facilities (UDO § 6.2.4.A.10);
- A scenic view from a public roadway (UDO § 6.2.4.A.11);
- Prime agricultural land (UDO § 6.2.4.A.12); and
- Farming as an economic activity (UDO § 6.2.4.A.12).

3

It is doubtful, and more likely impossible, that any project could encompass all of these scenarios simultaneously. The majority's reasoning effectively renders a conservation subdivision under the Ordinance impossible–something the Ordinance drafters surely did not intend. *See Four Seasons Mgmt. Servs. v. Town of Wrightsville Beach*, 205 N.C. App. 65, 82 (2010) ("It is well settled that 'in construing statutes courts normally adopt an interpretation which will avoid absurd or bizarre consequences, the presumption being that the legislature acted in accordance with reason and common sense and did not intend untoward results.'" (citations omitted)).

The Purpose statement articulated in Section 6.2.4.A provides a framework within which applications for conservation subdivisions are considered; it does not to create additional hurdles for development. I would thus affirm the trial court's judgment. And in light of this, I would conclude that Plaintiffs' request for remand for a determination of their entitlement to attorney's fees is moot.